This is time set for oral argument in the case of the Democratic National Committee v. Michele Reagan. Nice to see all of you. You may proceed. Thank you. Good afternoon, Your Honors. It's good to be before you again. My name is Bruce Baiva, and I represent the plaintiff's appellants in this action. I would like to reserve five minutes for rebuttal, if I may. As this Court knows, because we have been here before on these issues, plaintiffs challenge two provisions of Arizona law, the practice under Arizona law of throwing out entirely ballots that are cast in the wrong precinct on Election Day. We ask that this Court enjoin Arizona from throwing out these ballots of Arizona residents for offices for which they are eligible and have a constitutional right to vote. If passed as prologue, we know that in the upcoming midterm primaries and general elections that thousands of Arizona citizens will cast their ballot in the wrong precinct, often through no fault of their own, and their ballots will not be counted, even for offices for which they are eligible to vote. We know that the disenfranchised will be overwhelmingly, disproportionately Hispanic, Native American, and African American. More often than not, these disenfranchised voters won't be told their correct precinct, won't have the resources to go to the correct precinct in time, even if they are. So you made this case, of course, to the district court in a multiple-day trial, and the district court's findings were not in your favor. And so now here on appeal, we need to understand why the district court's actual findings were clear error. So the burden analysis is what we review for clear error. So help us understand that factor. Sure. I would say two things, Your Honor. One, many of the district court's factual findings actually were in our favor. The court just made legal errors that resulted in it drawing the wrong conclusions based on those findings. With respect to, for instance, the out-of-precinct issue that I was just referring to, the district court found our experts quite credible in that, for instance, in 2016, that minority voters voted twice as often out of precinct than non-white voters did. The district court found that that disparity was linked to social and historic conditions under the totality of the circumstances under Section 2, for instance. But one of the legal errors that the court made was in essentially finding that there had to be some threshold, taking the VRA analysis, Your Honor, to begin with, that there had to be some threshold number of voters that had to be disenfranchised in order for it to be considered to be sufficiently burdensome. Mr. Spiva, going back to what you said, your experts found that there was a linkage between the disproportionate effect of voting out of precincts and the historical facts. That's not how I recall the district court making its findings. I found, as I remember it, that the district court found that the out-of-precinct voting was not a cause of the disproportionality. There were other issues, such as increased mobility and location where they lived, which were not historical social reasons. And so, therefore, it found that this requirement was not causative of your disproportionate effect. Isn't that what they found? Well, two things, Your Honor. One, the Court did, in fact, find, for instance, that minorities were more likely to be renters due to housing discrimination, and thus were more likely to vote out of precinct. That's at our excerpts of records 7 and 42. But, Your Honor, it's correct that the Court did make a legal error. I know Your Honor didn't say that, but I'm saying that, in that it essentially kind of, rather than looking at this under the totality of the circumstances, it parsed the various factors that result in OOP voting and said, well, the issue isn't really that people who vote out of precinct have their ballots thrown out. The issue is that they don't go to the wrong right they don't learn the right precinct in the first place. That is both a legal and a factual error, I would submit, Your Honor. Why is that a legal error? That was, I think, key to the District Court's ruling, that the burden was minimal because the burden of finding your right precinct is just one of the minimal burdens of voting, generally. Well, I think taking the VRA analysis, it didn't look at it, I think, properly of the circumstances because it basically redefined the injury that plaintiffs have claimed, that is, that their ballot is thrown out if they go to the wrong precinct. That's the enforcement of the precinct voting rule, as I understand how the District Court analyzed it and made reference to registration. So there's a requirement that voters have to register to vote, and if they don't, then their ballots aren't counted. And so would you argue that the not counting of votes of people who didn't register constituted a Voter Rights Act violation, a Section 2 violation? No, Your Honor, because those people would not be permitted to vote to begin with, and there's good reason for that. But they would be qualified had they registered, right? Had they registered. they would be qualified had they registered, and yet their votes are being discounted. But I believe the courts of appeal don't evaluate the not counting of non-registered voters as being itself a discriminatory practice. Right. Well, under the totality of the circumstances, Your Honor, under the Senate factors, one of the things that courts look at is the tenuousness or lack thereof of the justification for whatever the voting regulation is. Certainly, registration is subject to being reviewed under that test. But I think most registration requirements would pass the test because there's good reason. The act of registration both establishes that you are qualified to vote, and there's a verification process of some kind that you are, in fact, eligible to vote. Here it's an enormous difference, Your Honor. But the requirement to vote within precinct is different in your view. So why is the requirement to vote within your precinct different than, for example, a registration requirement? Well, I mean, I guess two things. One, these people whose ballots are being thrown out, there's no question that, at least in terms of what we are challenging, that they are eligible, they have been registered, and that they have a right to vote for certain offices. And we're not saying that they should be permitted to vote for offices for which they're not eligible. But that's very different. But you need to challenge that the precinct voting system itself is not what the district courts say, which is a minimal burden on voting, that 27 states have it, that this is something that's fairly easy to determine your precinct. So that was the district court's view. So you would need to say that that is not a minimal burden on voting. So compared to registration, which you acknowledge is okay. So explain to me why that's the case. Right. Well, I guess a couple things, Your Honor. Registration rules are subject to a VRA analysis. So as, you know, Justice Scalia said in Chisholm, if you had a registrar's office that were open for three days, or one day, rather, a week, for three hours, and that impacted minorities more than non-minorities, that would constitute So the majority rejected Justice Scalia's analysis, as I recall. He was in the dissent, and they specifically rejected that. Not that notion, Your Honor. That has been widely cited and affirmed. It may be widely cited, but the majority rejected it. I don't think that particular statement of Justice Scalia. I mean, registration requirements are clearly subject to that VRA analysis, and so all I'm saying is they're not immune from that analysis. I do think in most instances they would come out as being proper because of the need to establish eligibility and to verify that. Here you have that verification and establishment of eligibility, and we are challenging. Right, but the state is saying we want people to vote within a precinct, and so the question is why is that rule itself more the obligation to discover your precinct more than a minimal burden, which is a factual finding by the district court? Right. So why is that clearly erroneous as a factual finding? Well, we are not challenging the State's ability to require people to vote within a precinct. We are challenging, though, the rule that says that if you go to the wrong precinct and here we have lots of evidence, by the way, that in Arizona, and you have to do a localized analysis, in Arizona that often happens through no fault of the voter. In fact, oftentimes through fault of the State. But what we are challenging is the fact that if you go to the wrong precinct, that your entire ballot is thrown out. So there is this problem. Well, how is that different from registration? If you vote when you're not registered, your ballot will be thrown out. Because with registration, you haven't established that you are eligible and that you are qualified to vote. And so I think in most instances that requirement and the way it's implemented would pass the test. It's not that it's not subject to the test, but it would pass the test. There are clearly good reasons for that. There's — but here what we have is we have — the State is not contesting, and the district court didn't find to the contrary, that these are individuals who are eligible to vote for certain offices. It's just simply saying that it's going to impose a penalty if you go to the wrong precinct. And if you look either under the totality of the circumstances under the Voting Rights Act or balancing the burden versus the State's interest under Anderson Burdick, there's really no interest, certainly no significant interest on the other side that justifies that. Breyer. Did I read the record wrong, but aren't 27 other States also using out-of-precinct voting? Not in the way that Arizona is, Your Honor. That is not correct. There are other States — I don't think it's 27, by the way, but there are other States that require precinct-based voting, but there are many fewer — there are not many States that will throw out the entire ballot for voting in the wrong precinct. And, Your Honor, I think that's — it would be a legal error, it was a legal error, to suggest that because a rule operates a certain way in another State, that it — that the way it operates in Arizona is okay under the Voting Rights Act. Arizona leads the nation by far. You've seen the chart in our brief in terms of out-of-precinct voting. And there's a reason for that. Because Arizona moves the polling places around. The Arizona — Well, we are to the extent that that is one of the things in the totality of the circumstances that contributes to this massive, you know, over-voting, and particularly over-voting by minorities in Arizona. But it should be a localized analysis. The fact that, say, Colorado, which I think is — there's a case from 2004 in Colorado that the other side cites, you know, the fact that they have precinct-based voting shouldn't — you can't just look at that and say QED for Arizona, because it's very different. Arizona, first of all, was in 2004, and the Court itself noted that by 2006, once they had a statewide registration system and they had technology that would allow them to potentially count those ballots, that its ruling might change. Number two, they actually counted votes for president and vice president. So they actually, essentially, didn't impose this unjustified penalty that we're talking about here. Very different — and they didn't lead the nation. There was testimony and evidence there that the — the poll workers were well-trained and always informed people when they were in the wrong precinct. Here, we have the opposite, and the district court didn't find it the contrary. Every single witness, save one, testified that they were not told the correct precinct. One was, but didn't have sufficient time to make it to the correct precinct. And as we've shown, and again, this is the linkage to these historical and social factors, it's much more burdensome, much more difficult for minorities, for low-income minorities to have the resources to get to another precinct. If you've gotten to the wrong precinct through public transportation and — and you have — you're working long hours, you may reach the polling place, and oftentimes people do, too late to get to another polling place by public transportation. Your time is running down. Do you want to get to the ballot collection issue? Yes, Your Honors. There, too, the district court's opinion was infected, including its fact findings, was infected by this legal — at least one legal error, which is essentially, I think, another way of imposing a quantification requirement that this Court, when it sat on bunk, I think rejected in Feldman. But basically here, rather than saying you have to quantify the district burden as between minorities and whites, it basically said, well, there are too few people that rely upon this. Are you talking about your Voting Rights Act claim or your Anderson-Burdick First Amendment, Fourteenth Amendment claim? I was referring to the Voting Rights Act claim, Your Honor, but I think that the same logic applies to both. There is no threshold amount of disenfranchisement or burdening of the vote that you have to show in terms of numbers of people before you make out either an Anderson-Burdick claim or a Voting Rights Act claim. If I might, I'd like to reserve the remainder of my time for rebuttal. Certainly. Thank you. May it please the Court. I'm Dominic Dre. And with Kara Carlson, I represent the defendant appellees, the State. I'll endeavor to save five minutes for Mr. Johnson, who's here on behalf of the interveners. I'd also like to thank at the outset the Court and all counsel for accommodating my need to reschedule from the original July 30th date for this argument. All that said, plaintiffs have failed to overcome two insurmountable obstacles to reversing the verdict below. The first of those is the standard of review, as this Court has explained it in Gonzales, and the second is the Supreme Court's precedent from Crawford. On the first point, the decision below carefully traced out a long opinion worth of fact findings that lead to the inevitable legal holding in that case. Chief among those is that neither the voting — neither the precinct vote rule nor HB 2023 represents a significant increase over the ordinary burdens of voting. And on that last point, the Court's borrowing directly from Crawford. That's the language that the Supreme Court used in Crawford to explain the standard. That is, that it has to represent a substantial burden on the right to vote or a significant increase over the usual burdens. And we have factual findings galore from the Supreme — from the trial court, rather, in which Judge Reyes explains at length that the burdens here do not represent an increase over the ordinary burdens. Page 45 for the OOP rule, the same thing at page 22 through 23 of the excerpts for the — for the ballot harvesting rule. And all of these make sense when you look at, as the Court is required to do, the entirety of Arizona's election system, including the availability of so many options to mitigate any burden that might exist. The Court traces those out as well, I might add, including the fact that every county operates a vote center that allows early voting in person. You have in-person voting, of course. You also have a very generous absentee voting process and a permanent absentee voter list that allows people to receive, without excuse, an absentee ballot as a matter of course. All of these things create a circumstance in which the burden visited on anyone to comply with HB 2023 or to vote in their correct precinct is really very, very minor if it's perceptible at all. Mr. Dray, do you agree with Mr. Spiva that the trial court was in error in commencing its analysis with the notion that there had to be a substantial amount of votes involved? I think he was talking about 10,000 votes. Do you think that that was an error? I don't think so. I'm also not totally sure that — Keep in mind that in 2000, the State went for the presidential candidate by 537 votes. Yes. Although this Court and others have rejected the idea that the margin has to be outcome determinative or that that's somehow a threshold requirement, which I think is a way of minimizing that as a, you know, fact, although we do bear in mind the outcome determinativeness. And actually, on that score, Judge Reyes took to heart the Chief Judge's dissent in the earlier appeal, and he explains at pages 57 and 58 of the opinion the way that he's going to accommodate that. And he takes account of the fact that there is no obligation for this to change the outcome. But nevertheless, why is the quantity relevant? The quantity is relevant because it gives us a clue as to whether this is just some inconvenience or whether it's a real, you know, denial or abridgment. Think about the language of what Section 2 requires. It requires that the State's provision result in a denial or abridgment, more than a mere inconvenience, of a noticeable group's right to vote, right to exercise the opportunity to participate and elect representatives. Thank you, Judge Beyer. That's a good correction. And one thing we see throughout the briefing and even today at argument from our friends on the other side is a conflation of the difference between the burden of complying with the law and the consequence of not complying with the law. And that's yes, it's true that if you don't comply with this law, your ballot doesn't get counted, but that's not the burden. The burden is going to your own precinct, or the burden is complying with HB 2023 by, for example, availing yourself of one of the many other ways that you can hand in your absentee ballot. So with that sort of point corrected, the burdens and interests in this case have been pretty clearly settled by the district court, in particular, as the burden measurement of the burdens is a fact question? Yes, yes. And in fact, now that we have an ultimate holding under Section 2, for example, we know that that's entitled to clear error review. In fact, that was one thing that's changed between the previous appeal and this one. The Chief Judge's dissent noted that in his estimation there was not an ultimate Section 2 finding as to whether or not under the totality of the circumstances this was burdensome or impermissibly burdensome or not. And now we do have that. So there's, I think, no lingering doubt that this is now reviewed for clear error. And it's impossible to think how you could do that without somehow including in that the assessment of a burden. It struck me in looking at the district court's opinion in the trial that there weren't actually too many factual disputes between the parties. I think the disagreement is in how you weigh the undisputed facts. Would you agree with that? In other words, the statistics were pretty much uncontested. The facts of the precincts were pretty much uncontested. So the question was, at least it seemed to me, is how you balance all those factors in a totality of the circumstance analysis. Do you agree with that or not? I have to push back a little bit on that. But I'll say at the outset that even if there is a question about how exactly you balance it under the totality of the circumstances, we know from Jingles and from Gonzales that once that's done, the ultimate Section 2 finding does get clear error review. But at a more fundamental level about way of assessing all of these different burdens, I think, for example, that the conclusion about whether a given law, compliance with a given law, represents an increase in the ordinary burden of voting, which is the language borrowed from Crawford, I think that that's a fact question. Does this represent an increase or not? And it's partly a fact question because, you know, the other side mentioned sort of in passing that there are ways that the State maybe isn't as helpful as it could be or something for people who are seeking out their correct precinct. But we know on page 45 and 44 and 45 of the record that Judge Reyes walks through all the many resources that are available in both English and Spanish to help people find their correct precinct. So all of those are fact findings that the district court had to do. And then I think there's also credibility determinations as to the State's interest. The district court took to heart the findings of the Commission on Electoral Reform. That's at page 38. And also the survey, I forget its exact name, but in which 94 percent of Arizonans said that it was easy to find their polling place. Those two things being relevant to 2023 and the precinct rule, respectively. You know, in their reply brief, our friends on the other side indicate that maybe it was some sort of evidentiary error for Judge Reyes to consider that Commission report, but that was never appealed. So that is definitely fair for him to have considered and not something to reverse now. But all of that goes to the State's interest in these rules. The same thing with the factual finding that absentee voting, this is at page 36, presents a great opportunity for fraud in the words of Judge Reyes. Those are all factual findings. And without them, you can't engage in the ultimate weighing that has to occur. And I think it's pretty clear that those are all correct. In fact, I think the other side agrees that they're all correct, because the only thing they allege is clear error in their reply brief is that little footnote where they say it was wrong for him to credit the Arizona witness who said it would take 20 minutes per ballot to sort out what someone could vote and couldn't vote out of precinct, that instead the Court should have credited a California witness who said that in this State it takes less time, I forget exactly how much. I think they're wrong, but that's the only thing I remember them saying that was clearly erroneous. And that's a rather minor component of assessing the burden. As for the State's interest in the precinct rule, we have a number of citations, and we know from testimony at trial about the burdens that the most populous counties, like Maricopa County, encountered in the 2016 presidential preference election, the primary election, which is all evidence that's available since our last time here. And in that case, the counties that tried to run these sort of large, single location vote centers found that they were mobbed with lines and they didn't have enough poll workers or stations at which to vote. It was acceptable for the counties and the State to take that into consideration. We know that the Court adopted the Sixth Circuit Sandusky reasons that a precinct model makes sense, which includes those administrability concerns that I just identified. That's at page 46. And then he says that plaintiffs are incorrect, that Arizona can accomplish all of its goals without the precinct vote rule. That's at 48. That's also a factual determination. Can the State or can the State not accomplish the goals of running an orderly election without requiring folks to vote in their own precincts? As for some of the other causes that the other side has identified, you know, residential mobility. I believe Your Honor asked about residential mobility. Those are all but conceded by their arguments in the 14th Amendment context to be the real causes for out-of-precinct ballot casting. It's not because of what Arizona does with the law after it's been voted that someone goes to the wrong precinct. Instead, these factors are. Kennedy. They say that the increased mobility, residential mobility, is a function of renting, is a function of greater amount of renting by minorities. So there's a causal link between those three facts. And on that point, which Judge Reyes considered as well, at page 75, he said that the lingering he noted the lingering effects, which Your Honor is referring to, and then said, but plaintiff's causation theory is too tenuous to support their VRA claim because nearly all costs of voting fall heavier on socioeconomically disadvantaged voters. That would be true for everything, by the way. The fact that polls close at 7 p.m. in Arizona falls heavier on people who have to work two jobs or don't own a car. Every regulation you can think of for elections is going to burden people who are less well-off. The Seventh Circuit noted that in the Franks case expressly by saying that it's disparately high rates of poverty rather than a racial group that explains the differences in that jurisdiction. And I take it your position would be that the finding that the causation is too tenuous is a finding of fact. Yes, sir. And actually, on the subject of those of the different causes and the reasoning, you know, in the Seventh Circuit, it brings to mind the requirement from this court, which is so oft cited in the Salt River decision, that a bare showing of statistical relationship is not sufficient. In these many examples where, yes, there's higher rate of residential mobility or, yes, there's, you know, lower English as a first language among certain minority groups, those are accepted correlations, but those are just bare statistical correlations. And it's a heavy lift to try and show that a State has done something unconstitutional or in violation of the Voting Rights Act. And the intuition for that should be clear. As this court explained in Public Integrity Alliance and as the Supreme Court did in the Arizona Independent Redistricting case, the relationship between Federal courts who are overseeing State elections processes and the lawmakers in the given States is structurally intended to defer to these findings of State interest. And I'm sure the other side will point out that there was never a case of someone mishandling an absentee ballot, but, of course, we know from Crawford that there was never a case of mishandling or voter impersonation in that case either. So it can't be the case that that's required. The flip side of that consideration at the level of sort of Federalism or the role of the courts is that if we did it differently, you would wind up with the kind of one-way ratchet that the Sixth Circuit and Ohio Democratic Party versus Husted and the Supreme Court as long ago as 1969 in the McDonald versus Chicago Board of Commissioners case has been pointing out, that we run a risk where States that expand their ballot access, as Arizona has done by allowing, as I was mentioning earlier, all of these many ways to vote by absentee ballot and to make that your once done it, you can't possibly try to move back without even the smallest correlation being subject to a Federal lawsuit. Obviously, we do not intend to suggest that the laws don't apply if you've once been generous, but it all fits within the analysis of trying to decide how the system as a whole burdens voters and how it serves the State's interests as a whole. Those, as I mentioned before, are all factual findings made at some length by the District Court and entitled to deference by this Court. With that, in the absence of any further questions, I'm happy to turn the microphone over to Mr. Johnson. Thank you, counsel. Thank you. May it please the Court, my name is Brett Johnson, and with me today is Colin Ayler on behalf of the intervener appellees. Just real quick on some of the questions that were previously presented. Chief Judge, you asked if there were disputes at trial. We had a few. Most importantly, in regard to some of the opinions of the experts and especially the opinions that were rightfully for Judge Reyes to decide. Judge Reyes mentioned that in his decision and said it was inappropriate for an expert witness to be giving legal argument. He obviously gave credence to some of the underlying facts. The big dispute there was a cherry-picking of facts. The cherry-picking of facts was very isolated items, item by item, that several of their experts, one in particular, Dr. Lichtman, continuously refused to acknowledge the mitigating aspects of Arizona law, both in the election scheme as well as in the socioeconomic aspects. For example, Dr. Lichtman had no idea about Medicaid and some of the other efforts to mitigate some of the socioeconomic aspects. I saw the — I mean, I grant you the difference on experts, which is opinion, not fact, but I really didn't see too many factual disputes. Well, Your Honor, in — I didn't. I think mostly people disagreed on how — what the facts meant in the overall scheme. I think that's fair, Your Honor. We had a pretty cordial trial, and I think that it was a matter of presenting both sides. And one thing in particular, I think there was a big difference on the interpretation, is that the appellants believe that you looked towards just one voting practice, either it be OOP or HB2023. And from the defendant's side, and especially the intervenors, was we wanted to look at the entire election scheme. How is this going to impact the local candidates, the local issues, for example, on both OOP and even HB2023? But concentrating on out-of-precinct voting, election bonds matter. The candidates at the local level matter. And if your relief is only to capture let's make sure that senators and the president are voted for, the laboratory of democracy is completely destroyed. And that is a fundamental issue as to why the individual intervenors, who are our city council people and people involved at the local level, found very, very important. As Judge Reyes did when he was weighing those interests with the government's interests against the minimal interests that the appellants presented. In regard to the causal link, Judge Bea, you're absolutely right. What the appellants kept on presenting during the trial level is A equals B equals C equals D, and you weren't able to vote. They immediately went to you're not able to vote and did some statistical analysis around that without identifying within the confines of either the Voting Rights Act or the Constitution as to what is the problem with A? What is the problem with B? What is the problem with C? To make that causal link throughout each of them, those would be subgroups. And each of those subgroups, according to Crawford, are entitled to analysis. They did not do that. Judge Reyes's determination that they did not follow that is a matter of factual determination in weighing the burden. They did not meet their burden. The burden is on them to do. Real quickly, Your Honors, I know it hasn't been mentioned so far, but in regard to intentional discrimination, I really, to be honest with you, when I read the briefs, I don't know where that lands. I do know that in the reply brief, they make reference to the City of Las Vegas, but the City of Las Vegas, obviously a district court case, but in that case, it did not mean that the individual legislator's opinion went to the entire legislature. What it meant was is that on isolated factors, a legislator may be deposed for that purpose. Under Masterpiece Cake Shop for another case they cited for that, Supreme Court case, which was limited to the facts of that case, it was an adjudicative body. It had absolutely nothing to do with the legislature making a determination amongst the body in trying to make the intent of one legislator, whether or not that's actually true in this case, to the entire body. That was a completely incorrect interpretation of that case. The other issue that I want to make sure I touch on, Your Honor, is we went through their pleadings. 27-day window. Judge Reyes mentioned that almost on every single page of his opinion, and yet we have no real answer from the appellants as to why it was clear error to rely not just on the 27-day window, but also on the special election boards, also on the curbside voting, also on the myriad ways of marketing and advertising that multiple government agencies and nonprofits get out the vote to ensure people have the opportunity to deliver in person their ballot. It comes down to a security standpoint. It comes down to the integrity of the voting system, and it's very important for our democracy. So as I say about the democracy, Your Honors, there are multiple ways that the government requires us to participate. Go to the DMV to get your driver's license, selective service, taxation, voting in person in many States, requesting a voter to return their ballot within a 27-day period through a myriad of different ways to the correct polling location, if you choose to vote in person, is not difficult. If I just may real quick, I believe that the Supreme Court in Storer made a practical point. As a practical matter, there must be substantial regulation of elections if they are to be fair and honest in some sort of order, rather than chaos, is to accompany the democratic process. These laws are to avoid that chaos. Thank you, Your Honor. Thank you, counsel. Mr. Butler. Yes, Your Honor. And Chief Judge Thomas, I would agree. It's not that we have no disputes with the district courts, any of the district court's fact findings, but I think that in large part, a lot of its findings actually support a finding on each of the three claims that we have made. You take the issue of intent that my friend on the other side ended with. You know, Judge Reyes's opinion recognizes that the debate over HB 2023 was infected by the racially charged LaFaro video. He recognizes this at ER 7273. He talks about the two predecessor bills and the very unusual, this is my language, very unusual procedure leading up to it as somewhat suspicious. I would say that's an understatement, but. The district court concluded that the legislature as a whole, or that the legislature, I don't know if he used as a whole, was sincere in its belief that HB 2023 was necessary as a prophylactic to avoid fraud. So although the district court recognized the evidence that was submitted, that was its ultimate finding. And so why is that clearly erroneous? Well, Your Honor, at ER 76 through 77 and 81, the Court said that some legislators were motivated by partisan interests, perhaps implicitly informed by racial biases. He then goes on to make, I think the finding Your Honor is alluding to, that this was enacted in spite of rather than because of the disparate impact. But that was its ultimate finding. But there's nothing to support that. That is totally unsighted. There is no evidence whatsoever that anyone who was motivated by partisan concerns did it in spite of the disparate impact that they were well aware of. And that's another finding of the district court on racial minorities. And so here again, I think there's a legal error. I'm not sure I understand that. So the district court reviewed all the evidence that was presented, all of the reasons, the various groups that spoke up in favor of it, including some minority groups. Of course, part of the Supreme Court has said that partisan interests are not necessarily racist. And so then made a conclusion based on all of this evidence. So what is it that makes that a clear error? Well, I think, Your Honor, it's not necessarily a clear error standard because I think the failure to see that using race as a proxy for partisan interests is racial discrimination that's forbidden by the 15th and 14th Amendment. So you're saying that the clear error is that there was evidence in the record that the legislature was making, enacting HB 2023 for racist reasons, for racial discrimination reasons. And that evidence is something that the district court didn't look at? Or are you just asking us to re-weigh what the district court weighed? No. The district court credited that some legislators ---- Are you asking us to re-weigh that? You're just saying the district court weighed the evidence for us? No. I think where the legal error comes, Your Honor, where you're not under a clear error standard is in not recognizing that where one uses race as a proxy to advance under the 14th and 15th Amendment. So where did the district court say that the legislature was using race to promote partisan interests? Where was that? ER 76 through 77 and 81. And there are ---- But where the district court is describing the evidence before it? Is that what you're saying? It's describing the evidence, but I would submit, Your Honor, that that's a finding of the district court. The district court also found that the debates over HB 2023 were racially charged. I don't have the exact language right here in front of me, but it talks about racial appeals that were made during HB 2023's passage, specifically the LeFaro video. And so, you know, what I would say is I don't really have that much of a beef with the district court's fact findings here, but it's, again, like in McCrory, it failed to see the forest for the trees. The only other thing, I know my time is up, but, you know, again, I think the legal error here with respect to the other issues, out-of-precinct voting, HB 2023, you know, one of the key legal errors is this essentially imposition of a threshold requirement of numbers of people. The only other thing I would say is that, you know, my friend on the other side talked about the experts and the linkage with the Senate factors. Judge Ray has credited our experts and their statements about, you know, whose fault it is in terms of why people were voting OOP, in terms of their finding of disparate impact, you know, all that. He credited our experts. He actually gave their experts very little weight. Thank you, Your Honor. Roberts. Thank you, counsel. Thank all of you for your presentations today, for your briefing. I know when we take up cases on an accelerated basis, it puts a burden on you and your clients, and so the Court appreciates it, and your ability to be here today so we can accommodate counsel and also accommodate our schedules. The case has just started to be submitted for decision. We'll be in recess.
judges: Thomas, Bea, Ikuta